MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

KYLE F. WALDINGER (CABN 298752)
HALLIE MITCHELL HOFFMAN (CABN 210020)
Assistant United States Attorneys

    450 Golden Gate Avenue, 11th Floor
    San Francisco, California 94102
    Telephone: (415) 436-6830/7129
    Facsimile: (415) 436-7234
    E-mail: Kyle.Waldinger@usdoj.gov
           Hallie.Hoffman@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 15-00035 JST |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| EVELYN LANGFORD, | Sentencing Date: June 26, 2015<br>Time: 9:30 a.m. |
| Defendant. | Court: Hon. Jon S. Tigar |

      The defendant Evelyn Langford is scheduled to be sentenced on June 26, 2015. Pursuant to a plea agreement with the government, Langford entered pleas of guilty on March 20, 2015, to Counts One and Two of the Information, which charged her with violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 666 (Bribery Concerning Programs Receiving Federal Funds).

      In anticipation of the sentencing hearing, the United States files this Sentencing Memorandum to address the offense conduct and the calculation of the Sentencing Guidelines, as well as to advise the Court of its sentencing recommendation. For the reasons set forth herein, the United States respectfully requests that this Court sentence the defendant to a term of imprisonment not greater than the low end of the advisory Guidelines range of 46 to 57 months. The United States recommends that the term of imprisonment imposed by the Court be followed by a three-year period of supervised release. The Court

should also order that restitution in the amount of $260,000 be paid to the Government of American Samoa ("ASG"). The United States concurs with the Probation Officer that no fine should be imposed. The Court must, however, impose a special assessment of $200.

## I.    Factual Background and Offense Conduct.

A central feature of this case is American Samoa. American Samoa is a territory of the United States located in the South Pacific Ocean, far from the nearest Federal courthouse. Although the Territory is part of the United States, it lies within no federal judicial district. *See United States v. Lee*, 472 F.3d 638, 645 (9th Cir. 2006) ("American Samoa is not within any judicial district . . . ."). Each year, the Territory's government receives millions of dollars in funding from the Federal government. Among the funds received by American Samoa was a National Emergency Grant ("NEG") in the amount of $24.8 million. The NEG was awarded to the Territory by the U.S. Department of Labor after a devastating earthquake and tsunami occurred in the region in September 2009. *See* PSR, ¶¶ 6-7.

The defendant Evelyn Langford served as the Director of the Department of Human Resources of the ASG from 2009 to the end of 2012. PSR, ¶¶ 6 & 59. After the 2009 tsunami, the defendant was one of the ASG officials tasked with administering the NEG and the distribution of funds under it. Toward this end, she was appointed as the Governor of American Samoa's Authorized Representative regarding the NEG. *See* PSR, ¶ 7.

One of the components of the NEG was a workforce development program, which was intended to provide job training for hundreds of participants. *See* Ex. 1, at 1 (letter from ASG Attorney General's Office); PSR, ¶ 7. A sizable chunk of the nearly $25 million in NEG funds awarded to American Samoa was earmarked for this program. An entity called the Native Hawaiian Holding Company ("NHHC") ultimately submitted a bid and scope of work to the ASG to provide the workforce development program called for under the NEG. *See* PSR, ¶ 8 (describing NHHC's proposed scope of work); Ex. 2, at 16-20 (Bates EL 000061-65) (scope of work). NHHC was associated with the co-conspirator Quin Rudin and others. PSR, ¶ 8.[1] In February 2012, the defendant Langford was one of several ASG

---

[1] Quin Rudin's case is pending before this Court in case number CR 13-00149 JST. Claude Kramer's case is pending before this Court in case number CR 15-00168 JST.

USA'S SENTENCING MEMORANDUM
CR 15-00035 JST                                                              2

officials who signed a contract with NHHC for the company to provide workforce development and training in American Samoa. *See* Ex. 2, at 13 (Bates EL 000058). Pursuant to the contract, the ASG agreed to pay the NHHC a total of $4,705,461. Ex. 2, at 1-2 (Bates EL 000046-47) (contract); PSR, ¶ 8. One provision of the contract specifically prohibited "Gratuities and Kickbacks," providing as follows:

> (1) <u>Gratuities</u>.  It shall be a breach of ethical standards for any person to offer, give, or agree to give any employee or former employee or for any employee or former employee to solicit, demand, accept, or agree to accept from another person, a gratuity or offer of employment in connection with any decision, approval, disapproval, recommendation, preparation of any part of a program requirement or a purchase request, [etc.] . . .

Ex. 2, ¶ 13(1), at 9 (Bates EL 000054). As noted in the PSR, the ASG was entitled to terminate NHHC's contract if it found that NHHC had offered agents or representatives of the ASG (like the defendant) any such gratuities "with a view toward securing an agreement or securing favorable treatment with respect to the performing of such an agreement." *Id.*, ¶ 13(1)(a).

The initial payment of NEG funds to NHHC occurred on March 30, 2012, when the ASG issued a check to NHHC in the amount of $1,568,487. Plea Agrm., ¶ 2, at 4:11-12.[2] Thereafter, the defendant requested a "loan" from Rudin  (Rudin had signed the contract on behalf of NHHC. *See* Ex. 2, at 13.) She subsequently received two payments – a $10,000 wire transfer from the bank account of another company controlled by Rudin (Dearborne International) and a $250,000 wire transfer from the NHHC's account. Both bank accounts were domiciled at Wells Fargo in this District, and both of the wires were sent to the defendant's bank account in Texas. PSR, ¶10. No "loan" paperwork was completed, and the defendant never repaid any of the money Rudin provided to her. Plea Agrm., ¶ 2, at 4:16-17. The defendant has admitted that, in asking for these funds, she acted corruptly and with the intent to be influenced or rewarded in connection with NHHC's and/or Rudin's ongoing relationship with the ASG. She also has admitted that, after receiving these funds, she did, in fact, provide favorable official action on behalf of Rudin and NHHC by making arrangements for NHHC representatives to meet with the Governor of American Samoa to "pitch" business ideas to him. Plea Agrm., ¶ 2, at 4:18-23.

As noted above, the contract between NHHC and the ASG prohibited the types of payments that the defendant received. *See* Ex. 2, ¶ 13(1), at 9. In addition, the NEG was administered by the Region 6

---

[2]  Another payment of $1,563,487 was made to NHHC on or about July 5, 2012.

USA'S SENTENCING MEMORANDUM
CR 15-00035 JST                            3

office of the U.S. Department of Labor in San Francisco.  At no time were officials in the Department of Labor notified of the payments that had been made by Rudin through his associated companies to Langford.  As the defendant admitted in her Plea Agreement, had Department officials learned of those payments, they would have prohibited her from receiving those funds.  Furthermore, the existence of those payments would have been material to the Department's decision whether to allow the ASG to dispense any NEG funds to NHHC at all.  Plea Agrm., ¶ 2, at 5:7-15.

At least one motive for the defendant's conduct is apparent.  As reported in the PSR, the defendant, an officer in the United States Army, continued to receive active duty pay for approximately 20 months after she transitioned to reserve status.  PSR, ¶ 28.  The Army ultimately discovered the error, and it sought repayment from her.  The defendant's debt to the Army was more than $185,000 at the time she requested the "loan" from Rudin, and she used the funds she received from Rudin to retire her debt to the Army.  PSR, ¶ 10.  Despite her repayment, the defendant was later court martialed by the Army for her conduct related to the overpayments.  *See* PSR, ¶ 28.

## II.   Guidelines Calculations.

The applicable Guideline provision for the offenses of conviction is U.S.S.G. § 2C1.1(a)(1).  Pursuant to that section, the base offense level is level 14.  As set forth in the PSR, and as agreed to by the defendant in the Plea Agreement, the value of the things obtained by the defendant as part of the offense conduct was more than $200,000, but not more than $400,000.  Plea Agrm., ¶ 7.b, at 6; PSR, ¶ 17.  This increases the defendant's offense level by an additional 12 levels.  *See* U.S.S.G. §§ 2C1.1(b)(2) & 2B1.1(b)(1)(G).  Assuming that the defendant continues to manifest an acceptance of responsibility for her crimes (and there is no reason to believe that she will not), she will be entitled at sentencing to a three-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

Based on the above calculations, the total offense level is level 23.  The defendant is in criminal history category I.  This establishes an applicable Guidelines range of 46 to 57 months.

## III.   Sentencing Recommendation.

In determining the appropriate sentence in this case, 18 U.S.C. § 3553(a) directs the Court to consider the following factors:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for—

        (A)    the applicable category offense committed by the applicable category of defendant as set forth in the guidelines . . . .

    (5)    any pertinent policy statement . . . .

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Based on a consideration of these factors, the United States submits that a substantial term of imprisonment not greater than 46 months (which is the low end of the advisory Guidelines range), coupled with a three-year term of supervised release, and a restitution order of $260,000 is sufficient, but not greater than necessary, to comply with the factors set out in Section 3553. The Section 3553 factors that the United States believes are particularly relevant to the Court's determination of the appropriate sentence here are discussed in more detail below.

**The Nature and Circumstances of the Offense and the Need to Impose a Sentence that Reflects the Seriousness of the Offense and the History and Characteristics of the Defendant**

As an initial matter, the offense conduct in this case was quite serious and involved an abuse of trust by a Territorial Government employee. Ms. Langford had the opportunity to interact with Rudin and to seek payments from him *because* of her position of trust and authority within the ASG. She abused that trust and authority, and did so at a time when the people of the Territory were experiencing great distress as a result of the tsunami and its concomitant economic and environmental effects.

There can be no serious dispute that the defendant knew better. She had had a successful career

in the United States Army before the offense conduct, rising to the rank of Lieutenant Colonel, and she was well versed in the principles that guide that organization.  Moreover, on numerous occasions, she was presented with the opportunity to advise or consult with her colleagues in the ASG regarding the payments that she received from Rudin through his companies.  There is no evidence that she sought any such advice or consultation.  Similarly, there is no evidence that any Department of Labor official in San Francisco – with whom the defendant frequently met and corresponded – was advised or consulted about the payments that Langford was receiving, despite numerous opportunities for her to do so.[3]

On the other side of the coin, some of the facts that underscore the seriousness of the offense conduct and the defendant's willing participation in that conduct cut in her favor.  Ms. Langford *did* have a long and successful career in the Army and served this country well for many years, including in a combat tour.  *See* PSR, ¶ 60.  And, in achieving success in the Army, she had to overcome some somewhat difficult familial circumstances.  *See* PSR, ¶¶ 37-38.  Moreover, the government must advise the Court that, when the defendant was contacted in 2014 by the FBI agent from Hawaii and counsel for the government from San Francisco, she confessed her crimes, admitting that she took money from Rudin and that she knew it was wrong.  (In that interview, she also admitted that she had provided false information to the Army regarding the source of the funds that she had used to pay her Army debt.)  After counsel was appointed, she agreed to waive indictment and to plead guilty to wire fraud and bribery charges.  The defendant's actions in this regard reflect both her acceptance of responsibility and the fact that her agreement to waive Indictment, proceed by Information, and plead guilty meant that the government was freed to focus on other, related, investigations.

---

[3] The defendant has submitted a psychologist's report to the Probation Officer, which in turn will be provided to the Court. *See* PSR, ¶ 53.  At this point, the United States is not aware of the specific arguments that the defendant may make based upon this report.  Nevertheless, the United States submits that the conclusion of Dr. Lines reported in the PSR that "under more psychologically intact conditions, the defendant would have known her conduct was inappropriate," PSR, ¶ 53, is contradicted by the defendant's admissions that she acted "corruptly and with the intent to be influenced or rewarded," Plea Agrm., ¶ 2, at 4:18, and, furthermore, that she "concealed the true nature and scope of [her] dealings with Rudin and NHHC" from employees of the ASG and the Department of Labor because of the fact that the payments she received were prohibited.  Plea Agrm., ¶ 2, at 5:10-11.  In short, these admissions support the conclusion that the defendant *did* appreciate the wrongfulness of her conduct at the time.  And the fact that she concealed things from other ASG employees and Department of Labor employees shows her consciousness that she was engaging in wrongdoing at the time.

USA'S SENTENCING MEMORANDUM
CR 15-00035 JST                                          6

**The Need to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct**

The defendant has been convicted of what are commonly described as "white collar" offenses. A sentence of imprisonment will promote respect for the law and will demonstrate that defendants who commit such financial-related crimes and public-corruption offenses will be held accountable when they break the law, just as defendants who break other types of laws.

Promotion of respect for the law ties in with deterrence. Cases involving white collar crime offer a special opportunity for the Court to achieve the goal of general deterrence.[4] A prison sentence for the defendant's conduct will serve as a powerful deterrent against the commission of such crimes by others. It is important to provide this deterrent "[b]ecause economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity," and, thus, "are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* This defendant apparently calculated that, although it was illegal, taking money from a company with whom the ASG was doing business was worth the risk. A sentence of imprisonment will change that calculus for other individuals who face choices similar to those faced by the defendant.

Moreover, the United States has a strong interest in rooting out entrenched corruption and other criminal activity in American Samoa. In a Territory like American Samoa, which is far from the mainland (indeed, even far from Hawaii), the citizens are entitled to know that Federal laws are in place to protect them and their institutions, and that those laws will be enforced by the criminal justice system of the United States. A sentence of imprisonment for the defendant's offenses will promote respect for the law in American Samoa. It will also assure Samoans that the laws of the United States apply fully in the Territory, and that this kind of conduct by public officials in their Territory will not be tolerated.

A review of some of American Samoa's economic statistics also helps put Ms. Langford's

---

[4] The United States believes that there is less of a need to impose a sentence designed to deter this particular defendant from committing future or to protect the public from this defendant's future crimes.

USA'S SENTENCING MEMORANDUM
CR 15-00035 JST                              7

crimes in their proper context. One estimate puts the 2008 GDP per capita in American Samoa as $7,874. *See* https://en.wikipedia.org/wiki/Economy_of_American_Samoa (last visited June 19, 2015); *see also* https://www.cia.gov/library/publications/the-world-factbook/geos/aq.html (last visited June 19, 2015) (per capita GDP in 2007 of $8,000). By contrast, California's per capita GDP is about $45,000. *See* https://en.wikipedia.org/wiki/List_of_U.S._states_by_GDP_per_capita (last visited June 19, 2015). While statistics for the median household income in American Samoa are difficult to find, a study by the U.S. Department of Commerce indicated that the median household income in American Samoa in 2000 was on about $17,018. *See* U.S. Department of Commerce, National Oceanic and Atmospheric Administration, "Demographic Baseline Report of U.S. Territories and Countries Adjacent to Coral Reef Habitats" at http://coris.noaa.gov/activities/coral_demographics/06_American_Samoa.pdf (also indicating that 61% of population had income below poverty line) (last visited June 19, 2015). What these figures show is that American Samoa is not an affluent Territory. Thus, even setting aside the funds that the defendant received from Rudin that she then paid back to the Army, the amount of money that she gained through the offense conduct was significant by American Samoa standards.

**IV.   Restitution.**

As set forth at the outset of this Memorandum, the United States requests that the Court enter a restitution order totaling $260,000, which represents the total of the cash payments that the defendant received from Quin Rudin through his companies. All but $10,000 of this total amount came directly out of funds provided to NHHC by the ASG. Although the remaining $10,000 came from funds held in a bank account in the name of Rudin's company Dearborne International, the parties agreed in the Plea Agreement that restitution in the total amount of $260,000 should be paid. *See* Plea Agrm., ¶ 10. Such an agreement is permissible under 18 U.S.C. § 3663(a)(3), which provides that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." The Clerk of the Court should use the following restitution address:

> American Samoa Government
> Office of the Attorney General
> A.P. Lutali Executive Office Building
> Attn: National Emergency Grant funds
> Pago Pago, Tutuila
> American Samoa 96799

**V.     Conclusion.**

For the reasons set forth above, the United States respectfully requests that the Court sentence the defendant Evelyn Langford to a term of imprisonment that should be no greater than 46 months, to be followed by a three-year term of supervised release. The United States also requests that the Court order the defendant to pay restitution in the total amount of $260,000, as well as the special assessment of $200.

DATED:   June 19, 2015                                       Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
_____

KYLE F. WALDINGER
HALLIE M. HOFFMAN
Assistant United States Attorneys