1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    MARC H. AXELBAUM  # 209855
2   marc.axelbaum@pillsburylaw.com
    LINDSAY A. LUTZ  # 254442
3   lindsay.lutz@pillsburylaw.com
    Four Embarcadero Center, 22nd Floor
4   San Francisco, CA  94111
    Telephone: (415) 983-1000
5   Facsimile: (415) 983-1200

6   Attorneys for Defendant
    EVELYN LANGFORD
7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            )   No. 3:15-cr-00035-JST
                                         )
12                        Plaintiff,     )   **DEFENDANT LANGFORD'S**
                                         )   **SENTENCING MEMORANDUM**
13        vs.                            )
                                         )   Date:  June 26, 2015
14  EVELYN LANGFORD,                     )   Time: 9:30 a.m.
                                         )   Judge: Hon. Jon S. Tigar
15                        Defendant.     )   Court: Courtroom 9, 19th Floor
16  _____ )

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2
                                                                                          Page

3
I.    INTRODUCTION..................................................................................................1

4
II.   ARGUMENT. ......................................................................................................3

5
      A.    The Court Has Broad Discretion In Sentencing. ......................................3

6
      B.    Ms. Langford's History, Personal Characteristics and the Circumstances
            of the Offense Support a Sentence Below the Guidelines Range...........................4

7
      C.    A Sentence Well Below the Guidelines Range is Required in Order to

8
            Avoid Unwarranted Disparities with the Great Majority of Public
            Corruption Sentences....................................................................................14

9
      D.    A Sentence Based on the Loss Table in USSG § 2B1.1 Would Be

10
            Unjust.............................................................................................................19

11
      E.    A Long Prison Sentence Is Not Needed to Protect the Public from Ms.
            Langford. ........................................................................................................21

12
      F.    The Need to Provide Restitution Weighs in Favor of a Shorter Period of
            Incarceration. ................................................................................................22

13
III.  BUREAU OF PRISONS DESIGNATION................................................................22

14
IV.   CONCLUSION.......................................................................................................23

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **Table of Authorities**

2

Cases

3

*Gall v. United States*
4          552 U.S. 38 (2007) ................................................................................. 3, 4, 6, 8

5
*Koon v. United States*
          518 U.S. 81 (1996) ....................................................................................... 3
6

*Pepper v. United States*
7          562 U.S. 476 (2011) ...................................................................................... 3

8   *Rita v. United States*
          551 U.S. 338 (2007) ...................................................................................... 3
9

*United States v. Blixt*
10         548 F.3d 882 (9th Cir. 2008) ....................................................................... 12

11
*United States v. Booker*,
12         543 U.S. 220 (2005) ................................................................................ 3, 12

13  *United States v. Cantu*
          12 F.3d 1506 (9th Cir. 1993) .................................................................. 12, 13
14

15  *United States v. Cunningham*
          05-CR-2137 (S.D. Cal. Nov. 28, 2005) ....................................................... 16

16
*United States v. Jefferson*
17         1:07-CR-00209 (E.D. Va. June 4, 2007) ..................................................... 16

18  *United States v. Lukens*
          1:95-CR-00041 (D.D.C. June 20, 1996) ...................................................... 15
19

20  *United States v. McDonnell*
          3:14-CR-00012 (E.D. Va. Jan. 21, 2014) ..................................................... 17

21
*United States v. Menyweather*
22         447 F.3d 625 (9th Cir. 2005) ............................................................. 12, 13, 14

23  *United States v. Mohamed*
          459 F.3d 979 (9th Cir. 2006) ....................................................................... 12
24

*United States v. Ney*
25         1:06-CR-00272 (D.D.C. Oct. 13, 2006) ....................................................... 15

26  *United States v. Renzi*
          4:08-CR-00212 (D. Ariz. Oct. 28, 2013) ...................................................... 15
27

28

*United States v. Zedner*
    401 F.3d 36 (2nd Cir. 2005), ........................................................................... 12

## Statutes and Codes

United States Code
    Title 18, Section 666(a)(1)(B) ........................................................................ 1
    Title 18, Section 1343 .................................................................................... 1
    Title 18, Section 3553(a) ................................................................... 2, 3, 4, 22
    Title 18, Section 3553(a)(1) ..................................................................... passim
    Title 18, Section 3553(a)(2)(B)-(C) .............................................................. 22
    Title 18, Section 3553(a)(2)(C) .................................................................... 21
    Title 18, Section 3553(a)(5) ................................................................... 11, 14
    Title 18, Section 3553(a)(6) .............................................................. 1, 14, 19
    Title 18, Section 3553(a)(7) .......................................................................... 22

United States Sentencing Guidelines
    Section 2B1.1 ........................................................................................ passim
    Section 2C1.1 ............................................................................................. 17
    Section 2C1.1(a) ........................................................................................... 1
    Section 5H1.3 ............................................................................................. 11
    Section 5K2.13 ........................................................................ 11, 12, 13, 14

## Rules and Regulations

Federal Rules of Criminal Procedure
    Rule 11(c)(1)(C) ........................................................................................... 1

## I.    INTRODUCTION

On March 20, 2015, defendant Evelyn Langford entered a plea of guilty, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, to one count of wire fraud, in violation of 18 U.S.C. §1343, and one count of bribery, 18 U.S.C. § 666(a)(1)(B).  Dkt. 11. Ms. Langford has admitted to requesting and receiving $260,000 from a contractor with the American Samoa government, whose work Ms. Langford partially oversaw in her work for the American Samoa government.  *Id.* at ¶ 2.  Ms. Langford subsequently made arrangements to have the contractor meet with the Governor of American Samoa for the purpose of pitching business proposals to him.  *Id.*

In the plea agreement, the parties agreed that a reasonable and appropriate disposition of this case is as follows: a sentence of not more than 57 months; 3 years of supervised release; no fine; and restitution as ordered by the Court.  Dkt. 11, ¶ 8.  The parties further agreed that under the Sentencing Guidelines, the base offense level (under USSG § 2C1.1(a)) is 14 points, with an additional 12 points for the value of things obtained of more than $200,000 but less than $400,000.  Dkt. 11, ¶ 7.  Because of Ms. Langford's acceptance of responsibility for the offense, the parties agreed that a 3-level reduction was appropriate.  *Id.*  Thus, the adjusted offense level under the Guidelines is 23.  *Id.*; *see also* PSR ¶¶ 3, 14-25.  Based upon this adjusted offense level and a criminal history category of I, the advisory Guideline range is 46 to 57 months' imprisonment.

Probation agrees with the parties' Guidelines calculation.  *See* PSR ¶ 3.  Probation also recommended, based on Ms. Langford's personal history and characteristics, that a variance be granted and that she be sentenced to a term of 36 months' imprisonment.  PSR, Sentencing Recommendation at 2.  Ms. Langford has no objections to the PSR.

For the reasons set forth more fully below, however, Ms. Langford respectfully submits, that a more substantial variance from the Guidelines is appropriate in this case.  In particular, a variance is needed under Section 3553(a)(6) to avoid substantial disparities with the vast majority of public corruption sentences, which are significantly lower than the applicable Guidelines.  Although Ms. Langford fully accepts responsibility for her offense and deeply

- 1 -

1    regrets what she did, public officials convicted of substantially more egregious conduct often

2    receive more lenient sentences than Ms. Langford's agreed-upon Guidelines range.  Former

3    Virginia Governor Bob McDonnell, the only other defendant of whom the defense is aware

4    convicted solely for providing access to other public officials (rather than for taking certain

5    official acts (e.g., supporting certain legislation)) in exchange for cash or gifts, received a

6    sentence that was less than 20% of the low-end of the applicable Guidelines range – and that

7    was after a lengthy and hard-fought trial.  *See infra* at Section II.C.2.  Sentences for bribery

8    convictions well below the applicable Guidelines ranges are the norm in this Circuit and

9    nationwide.  More than 60% of sentences in public corruption cases nationwide in fiscal year

10   2014 were below the applicable Guidelines range, and of those sentences, the median sentence

11   was 66.7% lower than the low end of the applicable Guidelines range.  *See infra* at Section

12   II.C.3.  A sentence 66.7% lower than the low end of Ms. Langford's Guidelines range (46

13   months) is **15 months**, not counting any other factors militating in favor of a variance.

14       But there are a number of other factors that support a variance, especially the nature and

15   circumstances of the offense and the history and characteristics of the defendant.  *See* 18 U.S.C.

16   § 3553(a)(1).  As described more fully below, Ms. Langford has been a dedicated and selfless

17   soldier, daughter, mother and public servant, but she has suffered some extraordinary traumas

18   and has been subjected to some nearly impossible demands that resulted in her having post-

19   traumatic stress disorder, which impaired her ability to understand the wrongfulness of her

20   conduct.  *See infra* at Section II.B.

21       Taking the above, as well as a number of other facts, circumstances and Section 3553(a)

22   factors discussed below, into account, Ms. Langford respectfully requests that the Court

23   sentence her to 12 months.  She further submits that allowing her to serve some of that time in

24   home detention or a halfway house would enable her to begin to make restitution sooner and

25   also allow her to care for and support her family, especially her 12-year-old son, Joshua.

26

27

28

1    **II.     ARGUMENT.**

2          **A.     The Court Has Broad Discretion In Sentencing.**

3          "It has been uniform and constant in the federal judicial tradition for the sentencing

4    judge to consider every convicted person as an individual and every case as a unique study in

5    the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment

6    to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the

7    principle that the punishment should fit the offender and not merely the crime."  *Pepper v.*

8    *United States*, 562 U.S. 476, at 487-88 (2011) (internal quotations and citation omitted).

9          This Court has broad discretion to sentence Ms. Langford.  In the wake of the sea

10   change occasioned by *United States v. Booker*, 543 U.S. 220 (2005), this Court again stands as

11   the arbiter of a just and proper sentence, empowered and required to "make an individualized

12   assessment" of a just sentence pursuant to the factors presented in 18 U.S.C. § 3553(a).  *Gall v.*

13   *United States*, 552 U.S. 38, 50 (2007).

14         In the post-*Booker* era, the Sentencing Guidelines "are not mandatory" and "only one of

15   the factors to be considered when imposing sentence."  *Id.* at 59.  For this reason, the Supreme

16   Court has emphasized that the Guidelines' advisory sentencing range is "the starting point and

17   initial benchmark" from which sentencing courts should begin to make their sentencing

18   determinations, but they "are not the only consideration."  *Id.* at 49.  Following the Supreme

19   Court decision in *Booker,* a district court must consider the other (co-equal) sentencing falters

20   listed in 18 U.S.C. § 3553(a), and not just the advisory Guidelines, in sentencing an individual.

21   *Booker*, 543 U.S. at 259-60.  Indeed, the Court may not even "presume that the Guidelines range is

22   reasonable," but "must make an individualized assessment based on the facts presented."  *Gall*, 552

23   U.S. at 50.  The court has wide latitude to impose a sentence below the Guidelines range, "perhaps

24   because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to

25   which the Commission intends individual Guidelines to apply, perhaps because the Guidelines

26   sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case

27   warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal

28   citations omitted).

1    Among the familiar factors that a court must consider are: (a) the nature and

2  circumstances of the offense and the history and characteristics of the defendant; (b) the need

3  for the sentence to reflect the seriousness of the offense, to promote respect for the law, to

4  provide just punishment for the offense, to afford adequate deterrence, to protect the public

5  from further crimes of the defendant, and to provide the defendant with needed educational or

6  vocational training, medical care, or other correctional treatment; (c) the kinds of sentences

7  available; (d) the need to avoid unwarranted sentencing disparities; and (e) the need to provide

8  restitution to victims of the offense. *See* 18 U.S.C. § 3553(a).

9    **B.    Ms. Langford's History, Personal Characteristics and the
          Circumstances of the Offense Support a Sentence Below the Guidelines Range.**

10

11    Section 3553(a)(1) is a "broad command to consider the nature and circumstances of

12  the offense and the history and characteristics of the defendant." *Gall*, 552 U.S. at 50 n.6

13  (internal quotations and citations omitted). Given the facts described in this section, this

    factor weighs heavily in favor of a downward variance from the Guidelines.

14

15    **1.    The Offense Conduct and Ms. Langford's Early Acceptance of
             Responsibility**

16    Ms. Langford was the Director of Human Resources of the American Samoan

17  government and the American Samoa Governor's Authorized Representative for Disaster

18  Recovery, and she had partial responsibility for administering a program paid for by a

19  National Emergency Grant ("NEG") awarded by the United States Department of Labor to

20  American Samoa for longer term workforce development following the 2009 tsunami. Plea

21  Agt., Dkt. 11 ¶ 2. The Native Hawaiian Holding Company, Inc. ("NHHC"), run in part by

22  Quin Rudin, had a contract with American Samoa in which it received some of these NEG

23  funds. *Id.* Ms. Langford accepted $260,000 from Quin Rudin. *Id.* She subsequently made

24  arrangements to have NHHC representatives, including Mr. Rudin, meet with the Governor

25  of American Samoa to pitch proposals regarding transportation and medical development

26  projects to the Governor. *Id.* Ms. Langford believed that these proposed projects would

27  benefit American Samoa. *See* Acceptance of Responsibility Statement.

28

1          Ms. Langford understands that it was wrong to engage in the offense conduct and

2    deeply regrets committing the offense.  PSR ¶¶ 13 (citing Acceptance of Responsibility

3    Statement), 23.  That said, Ms. Langford did not accept the money to fund a lavish lifestyle.

4    Rather, she used the funds she received to repay her debt to the military, as described more

5    fully below.  PSR ¶ 28.

6          As stated by a number of the many people who have submitted character letters on

7    Ms. Langford's behalf, the conduct leading up to this offense and the offense itself were

8    aberrant.  *See* Ex. A: Fesoliai Silia Time Ltr. (Ms. Langford exhibited "superior work ethic

9    and strong character" in her work with the NEG program, working through late hours of the

10   night and weekends); Patrick Reid Ltr. (when working with Ms. Langford in the American

11   Samoa Department of Human Resources, "Mrs. Langford never failed to conduct herself

12   with the utmost professionalism and consistently maintained a can-do attitude that was

13   contagious and that never failed to keep our enthusiasm and momentum alive despite such

14   daunting tasks, challenges, and obstacles.").  This is not to diminish Ms. Langford's

15   culpability, but rather to place it in the broader context of her life and work.

16         Importantly, Ms. Langford accepted responsibility for her actions very early on.

17   She cooperated with all requests by the government for interviews, providing truthful

18   information during three government interviews prior to being charged and without seeking

19   any form of immunity.  She pleaded guilty pursuant to information, not putting the

20   government to the task of indicting her.  She did so before receiving a single page of

21   discovery.  She owned up to what she had done and did not attempt to fight the charges

22   against her.  Her acceptance of responsibility has been extraordinary.

23                           **2.      Personal History and Family Life**

24         As Mr. Langford's husband, David Langford, puts it, "[b]e it her own family, my

25   family, her military family or friends or community, she has a gift for drawing in people to her

26   circle of family."  David Langford Ltr.  The 25 letters submitted in her support with the

27   sentencing memorandum are a testament to the positive impact that Ms. Langford has had upon

28   those in her "circle of family."

1              (a)      **Parents and Siblings**

2           Ms. Langford was born into a military family, with her father serving in the United

3    States Air Force, and as a result she moved around as a child.  PSR, at ¶ 36.  While Ms.

4    Langford thought that her family life during her childhood was normal at the time, as she grew

5    up, she began to realize how constricted her family life was.  Psychological Evaluation of Scott

6    Lines, Ph.D. ("Lines Report") (submitted with PSR), at 3.  Her family was ruled by her father,

7    who was an "authoritarian, intimidating presence."  Lines Report, at 2. As discussed in fuller

8    detail in the evaluation of Dr. Scott Lines and in the PSR, Ms. Langford's family dynamics

9    were highly unusual and unsettling, including a well-publicized incident involving her family

10   while her father was an elected official in American Samoa.  See, e.g., PSR ¶ 37; Lines Report,

11   at 3.  Dr. Lines opines that over time, Ms. Langford's judgment became impaired partially

12   because of the "psychological pressure of her relationship with her feared powerful father,

13   whom she felt she needed to obey."  Lines Report, at 8.

14          Ms. Langford's mother passed away in 2000.  PSR at ¶ 35.  As the eldest child, Ms.

15   Langford took up the reins in caring for the family—her five siblings and particularly her father,

16   who is now 79 years old.  *See id.*  Ms. Langford's siblings have written letters describing the

17   crucial role she has played in their lives.  *See* Letters of Carolina Siofele ("[Ms. Langford]

18   remains as the one my father solely depends on today"); Kalepo Vaitautolu ("I am where I am

19   today because of her leadership, mentorship, and guidance."); Nathan Vaitautolu (after their

20   mother passed away and Mr. Vaitautolu graduated from high school, he moved in with Ms.

21   Langford and she "didn't treat me any different from her children"); Natalie Wilson ("Since the

22   death of my mother, my sisters took on the role of a mother with me and are always there for

23   me.").

24          Ms. Langford's support for her father has been the most significant and, in crucial ways,

25   life-changing.  In 2008, Ms. Langford's father suffered a stroke and refused to move from

26   American Samoa to live with her in Texas, where Ms. Langford would be able to care for him

27   and he would be able to access better medical care.  *Id.* ¶ 48.  Ms. Langford went off active

28   military duty to move from Texas to American Samoa to care for her father.  *Id.*  At that point,

1    she had been in the military for about 26 years, with approximately 17 years of active duty

2    service as a commissioned officer.  She had just three years of active duty service remaining

3    before she would quality for pensioned retirement from the military.  Once she left, she could

4    not voluntarily return to active duty; she would have to be called back, such as might occur in a

5    time of war.  In moving to American Samoa, she thereby sacrificed a pension of roughly 80% of

6    her base pay (which was approximately $60,000 per year) for the rest of her life.  *See* Kalepo

7    Vaitautolu Ltr. (calling the move a "tremendous sacrifice").  Once she moved to American

8    Samoa, her father made substantial demands of time and money on her.  *See* Lines Report, at 5

9    (Ms. Langford "assumed responsibility for all of her father's expenses, which included his

10    mortgage, medical bills and financial obligations to church and village.  She estimated that his

11    financial obligations totaled over $1500 per month.").

12                    **(b)**      **Spouse and Children**

13          Ms. Langford has six children and is, by all accounts, an "excellent mother."  *See* PSR

14    ¶ 39 (recounting description from husband); Letters from David Langford, Benjamin Langford

15    ("She has always shown our family and everyone around her of what it means to become

16    love."), Timothy Pedro ("She is a loving figure of character, kindness and love for others from

17    her home, her community and her subordinates and peers"), Bethany Bibbens, and Beatrice

18    Foliaki.  Two of her children are from her first marriage, which ended in divorce in 2000.

19    Three children are step-children from her marriage to David Langford in 2001—although Ms.

20    Langford would never refer to them as her "step"-children.  *See* Bethany Bibbens Ltr. ("Even

21    though Evelyn is my stepmother, she loves me as if she gave birth to me and treated me as if I

22    was truly one of her own."), David Langford Ltr. ("One of the things I first admired about her

23    was her quiet but strong spirit and her caring and understanding heart. It was evident in how

24    Evelyn loved my daughters as if they were her own.").  The mother of Mr. Langford's three

25    daughters passed away in 2000, and Ms. Langford has stepped in to care for them.  *See* Beatrice

26    Foliaki Ltr. (Ms. Langford was there to "pick up the broken pieces of our family and help carry

27    us through life").

28

1      Finally, Ms. Langford and Mr. Langford have a son together, Joshua, who is 12 years

2  old.  PSR ¶ 39.  Joshua just completed 7th grade.  Ms. Langford takes being a mother very

3  seriously, and she is incredibly saddened that her poor choices will lead to her being imprisoned

4  during Joshua's formative years.  Sentencing Ms. Langford to a term that is at least partially

5  served through home detention will allow her to continue to care for her young son.

6                **3.**      **A Lifetime of Military Service**

7      In 1982, when she was just 17 years old, Ms. Langford enlisted in the U.S. Army.  PSR

8  ¶ 60.  After she graduated from Oklahoma Panhandle State University with a B.S. in Biology,

9  she reported for active duty. *Id.* ¶ 55.  She continued to serve in different capacities until June

10  2014. *Id.* at ¶ 60.  Ms. Langford was the first American Samoan woman to be promoted to

11  Lieutenant Colonel. *Id.*; *see also* Ruse Meleisea Wiley Ltr. ("Evelyn was the first female

12  Samoan officer to have reached the rank of Lieutenant Colonel due to her unlimited and

13  boundless potential as well as outstanding leadership in committing to nothing less than

14  excellence.")  During her time in the military, she received four Meritorious Service Medals,

15  five Army Commendation Medals, the Army Achievement Medal, the National Defense

16  Service Medal, the South West Asia Service Medal, the Global War on Terrorism Service

17  Medal, the Army Service Ribbon, the Overseas Service Ribbon, and the Armed Forces Reserve

18  Medal. *Id.*  According to an officer who served with Ms. Langford, Ms. Langford "personified

19  the Army values."  Ruse Meleisea Wiley Ltr.

20      In 2008, Ms. Langford made the decision to leave active military duty to move to

21  American Samoa to care for her father.  She failed to properly "process out" of active duty and,

22  as such, she continued to receive active duty pay when she should have been receiving reserve

23  duty pay.  In 2013, Ms. Langford pleaded guilty to conduct unbecoming an officer and a

24  gentlewoman, and received a sentence of a reprimand and forfeiture of her pay for five months.

25  PSR ¶ 28.  In 2014, Ms. Langford was nevertheless honorably discharged from the Army. *See*

26  PSR ¶ 60.

27

28

1
      **4.**      **Contributions to the Community**

2
      In the letters submitted on her behalf, Ms. Langford is time and time again described as

3
a generous, charitable woman.  For example, a letter from Mr. and Mrs. Mario Lefiti states,

4
"This is a woman that pours out her heart to so many people including her Pacific Islander

5
community, lending a helping hand where ever there's a need."  In addition to the 32 years of

6
military service she provided to this country, Ms. Langford has made countless contributions to

7
her community.  *See* Letters from David Langford ("From 2001 to 2008, Evelyn led all of the

8
community Army Asian Pacific events at Fort Sam Houston and in the city of San Antonio,

9
Texas."); Joe Katina (Ms. Langford was a guest speaker at events to inspire young Samoans to

10
pursue their dreams); Ricky Logo (Ms. Langford was "active in our church and the Samoan

11
community"); Vickie Haleck (Ms. Langford volunteered her time for the Teen Challenge

12
ministry for troubled and at-risk youths); Aloalii A. Sasa (Ms. Langford is "very active in our

13
church and started our music ministry for the youth as well as helping out with our children's

14
ministry," and flew to American Samoa to support Mr. Sasa at his wife's and mother's

15
funerals); Ella Wallace-Robinson (Ms. Langford has helped with the Katina Missions for many

16
years); Mariah Hiner (Ms. Langford helped friend's family whose son had passed away make

17
mourning process easier for their family); and Tumua Matu'u (Ms. Langford volunteered her

18
time for community event).

19
      **5.**      **Mental Health and Its Role in the Circumstances of the Offense**

20
      As part of the Court's analysis of the "nature and circumstances of the offense and the

21
history and characteristics of the defendant," (18 U.S.C. § 3553(a)(1), the Court should consider

22
Ms. Langford's mental and emotional health, especially the role it played in the offense.  As the

23
PSR Sentencing Recommendation recognizes, Ms. Langford "has experienced a significant

24
amount of trauma in her past and appears to have been under a significant amount of stress at

25
the time of the instant offense."  PSR, Sentencing Recommendation, at 2.  Ms. Langford was

26
evaluated by Clinical Psychologist Dr. Scott Lines in connection with the sentencing.  Dr. Lines

27
has concluded that Ms. Langford suffered from Posttraumatic Stress Disorder ("PTSD") at the

28

1   time of her offense, which resulted in diminished mental capacity and impairment in judgment

2   that contributed substantially to her committing the offense.  Lines Report, at 5-7.

3        As mentioned above, in 2008 Ms. Langford moved from Texas to American Samoa to

4   care for her ailing father and began a new job as the Director of Human Resources for the

5   American Samoa government.  The move was incredibly disruptive to her life, not just for Ms.

6   Langford but also for her husband and two youngest children who moved with her; however,

7   she moved because she felt a duty to care for her father.  Lines Report, at 4.  Around the same

8   time, one of her children suffered from serious health issues and had to be admitted to an

9   inpatient psychiatric facility.  PSR ¶ 49; Lines Report, at 4.  Ms. Langford felt tremendous guilt

10  for moving her family to American Samoa, and she blamed herself for her child's health crisis

11  and for causing her children to lose their social support system.  Lines Report, at 6.

12       Caring for her father, trying to help her husband and two sons adjust to their new life in

13  American Samoa, and handling her new job as the Director of Human Resources, including a

14  rigorous confirmation process, resulted in a high level of psychological pressure and stress in

15  Ms. Langford's life.  Then, on September 29, 2009, an earthquake and tsunami hit American

16  Samoa.  PSR ¶ 50.  Ms. Langford was driving to work when the earthquake struck, and recalls

17  feeling the ground shake under the car.  Lines Report, at 4.  Then, when the tsunami hit, she saw

18  the water rise rapidly on the roadway around her.  *Id.*  Thirty-two people died in the natural

19  disaster, including her aunt and cousin.  *Id.*  As a part of her government work related to the

20  relief effort, Ms. Langford was required to read the autopsy reports of those killed in the

21  disaster, including those of her aunt and cousin.  *Id.* at 5.  She worked tirelessly during this time,

22  getting no more than five hours of sleep a night, but still felt helpless because she could not help

23  all those who asked for her help.  *Id.* at 4-5.  At the same time, she tried to satisfy her father's

24  demands, supporting him financially at great expense.  *Id.* at 5.

25       In early 2012, the time period leading up to the offense conduct, Ms. Langford had the

26  added stress of trying to pay back the military for the salary overpayments she had received.

27  She had been using much of the extra salary she had received on her father's expenses, and she

28  could not immediately repay the money, as the military requested.  *See* Lines Report, at 5.  At

1  the same time, in February 2012, her young son (a different son than the one discussed at

2  paragraph 49 of the PSR) suffered from a serious medical condition that resulted in

3  hospitalization.  PSR ¶ 51.

4      All of these traumas had a severe effect on Ms. Langford's mental and emotional

5  health.  In the four years between Ms. Langford's father having a major stroke and the

6  offense conduct, Ms. Langford uprooted her family from Texas to American Samoa,

7  survived a tsunami in which she lost two family members, helped two of her sons through

8  major health scares, underwent the stress of her new job dealing with the tsunami relief

9  efforts, and made mind-boggling financial sacrifices for her father's sake.  In diagnosing

10 Ms. Langford with PTSD, Dr. Lines opined, "The extent of devastation created by the

11 tsunami impacted Evelyn directly, both in terms of her own direct exposure to the

12 earthquake and tsunami swell that flooded the island, and also because of the secondary

13 exposure via the impact the tsunami had on others."  Lines Report, at 5.  Dr. Lines observed

14 the clinical symptoms of PTSD in his evaluation of Ms. Langford:  intrusive thoughts of the

15 trauma, avoidance of traumatic stimuli, and autonomic numbing of responsiveness. *Id.*

16     The Court may consider Ms. Langford's mental capacity to commit the offenses to

17 which she has pled guilty as part of the "nature and circumstances of the offense and the

18 history and characteristics of the defendant" under Section 3553(a)(1).  Under 18 U.S.C.

19 § 3553(a)(5), the Court shall also consider any pertinent policy statement issued by the U.S.

20 Sentencing Commission.  The policy statement regarding diminished capacity set forth in

21 USSG § 5K2.13 is pertinent here.  *See also* USSG § 5H1.3 ("Mental and emotional

22 conditions may be relevant in determining whether a departure is warranted, if such

23 conditions, individually or in combination with other offender characteristics, are present to

24 an unusual degree and distinguish the case from the typical cases covered by the

25 guidelines.").  Section 5K2.13 is couched as a downward departure from the guidelines for

26 certain defendants whose diminished capacity contributed to the commission of the offense.

27 The Ninth Circuit has held that "the scheme of downward and upward 'departures' [has]

28 essentially [been] replaced by the requirement that judges impose a 'reasonable' sentence."

1   *United States v. Mohamed*, 459 F.3d 979, 986-87 (9th Cir. 2006); *see also United States v.*

2   *Blixt*, 548 F.3d 882, 890-91 (9th Cir. 2008) (treating a district court's analysis of a

3   downward departure under Section 5K2.13 as "'an exercise of post-*Booker* discretion to

4   sentence a defendant outside of the applicable guidelines range.'") (quoting *Mohamed*, 548

5   F.3d at 987).

6       In any event, to have qualified for a downward departure under Section 5K2.13 pre-

7   *Booker*:  (1) the defendant had to have committed the offense while suffering from a

8   significantly reduced mental capacity and (2) the defendant's significantly reduced mental

9   capacity must have contributed substantially to the commission of the offense.[1]

10   "Significantly reduced mental capacity" means the defendant "has a significantly impaired

11   ability to (A) understand the wrongfulness of the behavior comprising the offense or to

12   exercise the power of reason; or (B) control behavior that the defendant knows is

13   wrongful."  USSG § 5K2.13, app. note 1.[2]  The Ninth Circuit has held that PTSD can be a

14   "significantly reduced mental capacity" when the ailment distorted the defendant's

15   reasoning and interfered with the defendant's ability to make considered decisions. *See*

16   *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) (holding that a Vietnam War

17   veteran's PTSD constitutes a significantly reduced mental capacity for the purpose of

18   § 5K2.13 and that his disorder contributed to the commission of his offense); *see also*

19   *United States v. Menyweather*, 447 F.3d 625, 632 (9th Cir. 2005) (upholding downward

20   departure based on diminished capacity where PTSD of defendant (an administrative

21   employee in the Los Angeles U.S. Attorney's Office), which was caused by her

22

23   _____

[1] By its terms, Section 5K2.13 excludes from its ambit defendants whose diminished
24   capacity was caused by drug use, violent offenders, recidivists requiring imprisonment for
the sake of public safety, and defendants convicted of certain listed crimes not at issue
25   here.  Ms. Langford does not fall within any of these exclusions.

[2] NB: Sentencing a defendant based in part on diminished mental capacity is not
26   inconsistent with a finding that the defendant possessed the requisite criminal intent.
*United States v. Zedner*, 401 F.3d 36, 52 (2nd Cir. 2005), *rev'd on other grounds,* 547
27   U.S. 489 (2006). "The defendant could have acted with criminal intent so as to be guilty
of a crime, while at the same time suffering from a diminished mental capacity that would
28   justify departure." *Id.*

1   abandonment by her parents and witnessing her fiancé's murder 8 years prior to the offense

2   conduct, contributed to her use of government credit cards to make unauthorized personal

3   purchases of between $350,000 and $500,000).

4          Under the Section 5K2.13 framework, the defendant's ailment must also "contribute

5   substantially" to the commission of the offense.  USSG Manual § 5K2.13 (2015).  The

6   Ninth Circuit has held that the "disorder need be only a contributing cause, not a 'but for' or

7   a 'sole' cause, of the offense."  *Cantu,* 12 F.3d at 1515 (holding that defendant's PTSD,

8   caused by his experiences in the Vietnam war, created a fixation on weapons, which

9   contributed to his offense of being a felon in possession of a firearm); *see also*

10  *Menyweather*, 447 F.3d at 632.

11         At the time of the offense, Ms. Langford lacked the ability to understand the

12  wrongfulness of her conduct and was unable to exercise reason in making her decisions.  In

13  considering a defendant's diminished capacity in the sentencing calculus, courts have given

14  substantial weight to the opinion of the licensed psychologist who evaluated the defendant.

15  *See e.g., Menyweather*, 447 F.3d at 631-32.  Dr. Lines has opined that at the time of the

16  offense Ms. Langford was "operating under considerable psychological pressure." *Id.* at 6.

17  Her psychological pressure, described more fully in the Lines Report, was the result of

18  several factors:  the tsunami; her role in American Samoa's relief effort, requiring her to

19  deal with death and destruction in her life and the lives of many others on a daily basis for a

20  prolonged period of time; extreme financial and other support obligations to her family; and

21  extreme traumas occurring in her family.  *Id*. at 6-7.  Dr. Lines "found clear evidence" of

22  PTSD during his examination of Ms. Langford.  *Id.* at 5.  Further, Dr. Lines states that Ms.

23  Langford's longstanding PTSD diminished her overall cognitive and emotional functioning

24  at the time of the offense.  *Id.* at 7.

25         Dr. Lines' report shows that Ms. Langford was suffering from a significantly

26  reduced mental capacity, which contributed substantially to the offense.  As Dr. Lines

27  states:

28

1   "Under more psychologically intact conditions, she both would
    have known her conduct to be inappropriate and would have been
2   able to prevent herself from engaging in that conduct by not
    entering into an arrangement with the executive in question.
3   Instead, her cognitive capacity was overwhelmed with the myriad
    factors identified in this evaluation and her reasoning was
4   substantially distorted.  As a result, her knowledge of the conduct as
    wrong was questionable and her ability to withstand engaging in the
5   conduct was lacking.  Both are features of her diminished mental
    capacity and impairment in judgement."

6

7   *Id.* at 7.  At the time of the offense, her impaired ability to reason "allowed her[ ] to be used

8   by the Native Hawaiian Holding Company." *Id.*

9        Putting aside the other grounds in this Memorandum for a variant sentence, Ms.

10  Langford's mental health issues – whether considered under the diminished capacity

11  analysis of Section 5K2.13 (incorporated through Section 3553(a)(5)), or directly under

12  Section 3553(a)(1) – should alone qualify Ms. Langford for a substantially below-

13  Guidelines sentence.

14       **C.      A Sentence Well Below the Guidelines Range is Required in Order to
             Avoid Unwarranted Disparities with the Great Majority of Public Corruption**
15       **Sentences.**

16       18 U.S.C. § 3553(a)(6) directs the Court to consider "the need to avoid unwarranted

17  sentence disparities among defendants with similar records who have been found guilty of

18  similar conduct."  A sentence within the Guidelines range of 46 to 57 months would create

19  unwarranted disparities between Ms. Langford's sentence and other sentences handed out in

20  public corruption cases.  First, public officials convicted of substantially more egregious

21  conduct often receive more lenient sentences than Ms. Langford's agreed-upon Guidelines

22  range.  Second, the only other defendant of whom the defense is aware who was convicted

23  solely for providing access to other public officials (rather than in exchange for taking

24  certain official acts (e.g., supporting certain legislation)) – the former Governor of Virginia

25  – received a sentence that was less than **20%** of the low end of the applicable Guidelines

26  range.  Finally, sentences for bribery convictions well below the applicable Guidelines

27  ranges are the norm in this Circuit and nationwide.

28

1. **Public officials convicted of more egregious conduct typically receive sentences lower than the low end of Ms. Langford's Guidelines range.**

Public officials convicted of conduct within the "heartland" of public corruption statutes – such as rigging government contracts or interfering with government investigations in exchange for personal benefit – often receive sentences well below 46 months, the low end of the agreed-upon Guidelines range in this case.  For example:

- U.S. Representative Richard Renzi received a 36-month sentence for supporting federal legislation in exchange for personal benefits despite having a Guidelines range of 97 to 121 months. Judgment at 1, *United States v. Renzi*, 4:08-CR-00212 (D. Ariz. Oct. 28, 2013), Dkt. 1318; Gov.'s Sentencing Mem. at 2 (Oct. 21, 2013), Dkt. 1307.[3]

- U.S. Representative Robert Ney received a 30-month sentence for his role in the Jack Abramoff scandal.  Rep. Ney supported and amended legislation, inserted statements into the Congressional Record, and influenced federal agency decision-making in exchange for hundreds of thousands of dollars in cash and in-kind benefits.  Factual Basis for Plea at 3-11, *United States v. Ney*, 1:06-CR-00272 (D.D.C. Oct. 13, 2006), Dkt. 5; Judgment at 2 (Jan. 3, 2007), Dkt. 20.[4]

- U.S. Representative Donald "Buz" Lukens received a 30-month sentence for accepting money in exchange for attempting to end a pending federal investigation. *United States v. Lukens*, 1:95-CR-00041 (D.D.C. June 20, 1996).

---

[3] The Government requested a 108 to 144 month sentence. Govt. Sentencing Mem. at 2 (Oct. 21, 2013), Dkt. 1307.

[4] As described below, 12 of Ms. Langford's 23 adjusted offense level points are derived from the § 2B1.1 loss table.  Rep. Ney received no adjustment under this table, despite a gain that should have merited a 10- to 12-level increase under § 2B1.1 (as incorporated by the 2003 version of § 2C1.7(b)(1)(A)).  Plea Agreement at 4 (Oct. 13, 2006), Dkt. 4.

1    Only where public officials have been convicted of extraordinarily egregious

2    conduct have courts chosen to impose lengthier sentences, and even then below-Guidelines

3    sentences are common.  For example, U.S. Representative William Jefferson was convicted

4    of influencing U.S. and African officials in exchange for hundreds of millions of dollars—

5    including $100,000 in cash from an FBI informant, most of which was later found hidden in

6    his freezer. Indictment at 32-33, *United States v. Jefferson*, 1:07-CR-00209 (E.D. Va. June

7    4, 2007), Dkt. 1.  Despite the extreme nature of Rep. Jefferson's conduct and the huge sums

8    involved, the court rejected a Guidelines range of 262 to 327 months in favor of a 156-

9    month sentence – less than 60% of the low end of his applicable Guidelines range.

10   Judgment (Nov. 13, 2009), Dkt. 624.

11   U.S. Representative Randall "Duke" Cunningham pleaded guilty to receiving at

12   least $2.4 million in bribes and in-kind gifts, including a 42-foot yacht named the "Duke-

13   Stir." Indictment at 6, *United States v. Cunningham*, 05-CR-2137 (S.D. Cal. Nov. 28,

14   2005), Dkt. 1.  In exchange, Rep. Cunningham attempted to direct Congressional

15   appropriations and Department of Defense contracts to his co-conspirators. *Id.*  Again,

16   despite the egregious nature of Rep. Cunningham's conduct, the court sentenced him to 100

17   months' imprisonment, only 74% of the low end of his Guidelines range of 135 to 168

18   months. Plea Agreement at 24 (Nov. 28, 2005), Dkt. 40-2; Judgment at 2 (Apr. 6, 2006),

19   Dkt. 34.

20   Ms. Langford's conduct pales by comparison to these defendants and she deserves

21   an lower sentence proportionally.  Without minimizing the gravity of her offense, she

22   pleaded guilty to arranging a meeting between Quin Rudin and the Governor of American

23   Samoa.  She did not influence government officials, corruptly support legislation, attempt

24   to end an investigation, or conspire to extort hundreds of millions of dollars.

25            **2.      The only other public official convicted for access-based conduct
                        received a sentence well below the applicable Guidelines range.**

26

27   The defense is aware of only one case in which a public official was sentenced

28   purely for access-based conduct.  Former Virginia Governor Bob McDonnell was recently

1    convicted for receiving in-kind gifts in exchange for providing access to events at the

2    Governor's mansion and arranging meetings with state officials.  Indictment at 7-32, *United*

3    *States v. McDonnell*, 3:14-CR-00012 (E.D. Va. Jan. 21, 2014), Dkt. 1, *appeal filed*, No. 15-

4    4019 (4th Cir. argued May 12, 2015); Amended Judgment at 1 (Jan. 13, 2015), Dkt. 627.[5]

5    Gov. McDonnell's conviction represented what we believe to be a new application of

6    federal bribery law: a conviction merely for providing access to government officials. No

7    "official act" other than increased access to state officials was exchanged in the *quid pro*

8    *quo*. Def.'s Sentencing Mem. at 30 (Dec. 23, 2014), Dkt. 582.  The court sentenced Gov.

9    McDonnell to 24 months' imprisonment – **19.8%** of the low end of his Guidelines range of

10    121 to 151 months. Def.'s Sentencing Mem. at 37 (Dec. 23, 2014), Dkt. 582; Amended

11    Judgment at 3 (Jan. 13, 2015), Dkt. 627.

12          Like Ms. Langford, Gov. McDonnell did not provide tangible preferential treatment

13    and this was reflected in his sentence.  But unlike Gov. McDonnell , the highest-ranking

14    elected official in the Commonwealth , Ms. Langford did not fight the charges against her

15    through a lengthy trial.  She fell on her sword very early in this case – even before any

16    discovery was provided – admitting her conduct the first time the government asked her

17    about it.

18          **3.    Sentences well below applicable Guidelines ranges are exceedingly common in public corruption cases.**

19

20          Sentences well below applicable Guidelines ranges are the norm for public

21    corruption cases, as shown by statistics published by the U.S. Sentencing Commission. **In**

    **Fiscal Year 2014, *60.4% of sentences imposed nationwide under USSG § 2C1.1 were***

22

23    **below the Guideline range—and that excludes sentences where the government**

24    **sponsored a departure pursuant to Sections 5K1.1, 5K3.1, or otherwise.**  This compares

25

26    [5] The value of in-kind gifts received by Gov. McDonnell and those acting with him was disputed, with the government valuing the gifts at nearly $177,000 and Gov. McDonnell

27    at under $20,000. *See* Govt. Sentencing Mem. at 9 (Dec, 23, 2014), Dkt. 591; Def.'s Objections to PSR at 12 (Dec. 23, 2014), Dkt. 592. The court determined the value of the

28    gifts was between $97,000 and $121,000 and applied an 8-level increase under the § 2B1.1 loss table. See Sentencing Hr'g Tr. at 27:16-24 (Jan. 6, 2015), Dkt. 604.

1   with 30.7 % of sentences nationwide for all crimes.[6] *See* FY2014 Report, at Tables 1, 5

2   (104 of 175 sentences).  This below-Guidelines trend is supported by historical data for

3   sentences in cases where bribery is the primary offense category from:  2013 (100 of 187

4   sentences below Guidelines), 2012 (83 of 151 sentences), 2011 (80 of 177 sentences), and

5   2010 (88 of 177 sentences).  *See* FY2013 Report, FY2012 Report, FY2011 Report, FY2010

6   Report, all at Table 5.

7           Not only are below-Guidelines sentences in bribery cases prevalent, the degree to

8   which sentences are below-Guidelines is pronounced.  Among below-Guideline bribery

9   sentences in Fiscal Year 2014, again excluding sentences that also included government-

10  sponsored departures, **the nationwide median below-Guideline sentence was *eight***

11  **months' imprisonment, representing a twelve-month or *66.7%* median percent**

12  **decrease from the low end of the applicable Guidelines**.  *See* FY2014 Report at Table 12

13  (429 sentences).[7]  **This trend is mirrored in the Ninth Circuit, where the median**

14  **bribery sentence during Fiscal Year 2014 was just *ten* months.**  *See* Ninth Circuit

15  FY2014 Packet, at Table 7.

16          Throughout the Ninth Circuit and nationwide, courts have decided the Guidelines

17  sentencing ranges for bribery crimes are far too high and, accordingly, have consistently

18  handed down substantially lower sentences.  Applying a 66.7% reduction to the low-end of

19  _____

20  [6] National statistical data for fiscal years prior to 2015 is provided by the U.S. Sentencing
    Commission in the form of "Final Quarterly Data Reports" available at
21  http://www.ussc.gov/research-and-publications/federal-sentencing-statistics/quarterly-
    sentencing-updates.  For fiscal year 2015, data for the first quarter (October through
22  December 2014) is also available at that same location.  Citations to national data from
    the aforementioned reports will be cited herein as, for example, "FY2014 Report."
23  Regional data is provided in the form of "Statistical Information Packets" available at
    http://www.ussc.gov/research-and-publications/federal-sentencing-statistics/federal-
24  sentencing-statistics-district-circuit-state. Citations to regional data will be cited herein as,
    for example, "Ninth Circuit FY2014 Packet."

25  [7] We acknowledge that these data are only for below-Guidelines sentences (as noted,
    excluding sentences that also involved a government-sponsored departure), and do not
26  include the 39.6% of sentences that were above or within the Guidelines.  Unfortunately,
    the Sentencing Commission does not appear to publish data on the median percentage
27  decrease for bribery sentences overall.  That said, according to the Commission, the
    median sentence for bribery nationwide in fiscal year 2014 was 12 months (FY2014
28  Report, at Table 19).

1   Ms. Langford's Guidelines range (46 months) results in a **15-month** sentence – irrespective

2   of any other sentencing factors.  While Ms. Langford acknowledges the impropriety of her

3   conduct and deeply regrets what she did, we submit that the facts of her case, including her

4   personal characteristics and the circumstances of the offense (*see supra*), do not merit a

5   more severe sentence than that of the median below-Guidelines bribery case – or for that

6   matter, the median bribery sentence of 12 months (*see* FY2014 Report, Table 19).  If

7   anything, the facts of her case, while serious, appear to be less serious than many reported

8   bribery cases (as noted above).  Although our requested sentence of 12 months is lower

9   than that prescribed by the Guidelines (and the lower sentence recommended by Probation),

10  such a sentence is needed to avoid unwarranted sentencing disparities, 18 U.S.C.

11  § 3553(a)(6), and is reasonable and appropriate, especially when one considers the other

12  factors addressed above and below.

13       **D.**     **A Sentence Based on the Loss Table in USSG § 2B1.1 Would Be Unjust.**

14       In addition, Ms. Langford's Guidelines range of 46 to 57 months is largely founded

15  on the 12-level increase for the value of the money she received, per the USSG § 2B1.1 loss

16  table (incorporated via Section 2C1.1(b)(2)).  There has been resounding criticism of the

17  Section 2B1.1 loss table, with judges and practitioners alike expressing concern that it does

18  not appropriately measure the seriousness of economic offenses and, thus, is unduly

19  punitive.  *See* U.S. Sentencing Commission, Comments by Vice Chair (and Judge) Breyer,

20  Video Recording of Public Meeting at 29:00-29:30 (Apr. 9, 2015),

21  http://www.ussc.gov/videos/public-meeting-april-9-2015 (transcript not yet available)

22  ("USSC Hearing Video").  Recognizing this controversy, the Sentencing Commission

23  identified economic crimes as a priority for the 2014-2015 amendment cycle.  *See* U.S.

24  Sentencing Commission Selects Policy Priorities for 2014-2015 Guidelines Amendment

25  Cycle (Aug. 14, 2014), http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-

26  news-advisories/press-releases/20140814_Press_Release_Revised.pdf.

27       In addition, the American Bar Association's Criminal Justice Section created the

28  Task Force on The Reform of Federal Sentencing for Economic Crimes, which issued a

1    report suggesting dramatic changes to the Section 2B1.1 loss table, including higher loss

2    thresholds, lower corresponding adjustments, and additional culpability adjustments. *See* A

3    Report on Behalf of The American Bar Association Criminal Justice Section Task Force on

4    The Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014),

5    http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_cri

6    mes.authcheckdam.pdf ("ABA Report").

7          Currently, the loss table contributes nearly half of the points in Ms. Langford's total

8    offense level before the reduction for acceptance of responsibility (12 of 26 points).  PSR at

9    ¶ 17.  Using the ABA Report's proposed approach, Ms. Langford's total adjusted offense

10    level would be as low as 7 and as high as 17 points, with a corresponding Guidelines range

11    as low as 0 months and as high as 30 months.[8]

12          While the Sentencing Commission did not implement the suggestions made by the

13    ABA Report in the most recent amendment cycle, Commissioners expressed their approval

14    of the ABA Report's focus on culpability rather than loss amounts alone. Far from

15    indicating that the ABA Report was too lenient, Commissioner Barkow called for even

16    more widespread focus on culpability, stating:

17            I agree with the ABA's diagnosis of what is wrong with the fraud
                guidelines, and also its focus on a solution that's targeted towards
18            culpability.  But the problem of insufficient attention to culpability
                is not unique to fraud.  It is widespread throughout the Guidelines
19            Manual and, in fact, goes to the very core of the Guidelines
                approach.  The Guidelines place an emphasis on objective factors of
20            harm without paying much attention to the defendant's culpability

21

[8] Current Guidelines Calculation          ABA Report

22    14    base offense level          14          base offense level
    +12  § 2B1.1 loss table         +6          revised loss table
23    -3    acceptance of responsibility    -3          acceptance of responsibility
                              0 to -10   culpability adjustment
24    *23*   *total offense level*         *7 to 17*    *total offense level*

25    The ABA Report includes a nonexclusive list of culpability factors, such as (i) the
    defendant's motive, (ii) the degree to which the offense was sophisticated or organized,
26    (iii) the duration of the offense, and (iv) any extenuating circumstances. *See* ABA Report.
    We submit that Ms. Langford should receive a substantial reduction under these
27    culpability factors.  However, even if Ms. Langford did not receive a culpability
    adjustment under the ABA Report, her Guidelines range would nonetheless be
28    significantly reduced from 23 to 17.

1    with respect to that harm. . . .  The unlucky are placed in the same
     grid as the malevolent.  The question is how to fix this fundamental
2    problem that transcends fraud and permeates the book.

3    USSC Hearing Video at 33:20-34:10.

4          The ABA Report is obviously not binding on the Court.  But the criticisms in the

5    Report are valid.  The section 2B1.1 loss table focuses too much on financial loss/gain and

6    assigns too many points (i.e., months of prison time) per dollar received and therefore is, as

7    Judge Breyer stated, unduly punitive.  We ask that the Court take these criticisms (and the

8    solution set forth in the ABA Report) into consideration when assessing whether a

9    Guidelines sentence is appropriate for Ms. Langford.

10         **E.     A Long Prison Sentence Is Not Needed to Protect the Public from Ms.**
                    **Langford.**
11

12         The Court must impose a sentence that "protect[s] the public from further crimes of

13   the defendant." 18 U.S.C. § 3553(a)(2)(C). There is no need to imprison Ms. Langford for a

14   long period of time to accomplish that goal because there is very little risk she will commit

15   crimes in the future.  Probation recognizes, "[h]er conduct appears to be a response to the

16   immediate circumstances in her life and are not necessarily representative of a lifestyle of

17   criminal conduct for personal gain."  PSR Sentencing Recommendation, at 2.  Ms.

18   Langford has no unrelated prior criminal history, drug abuse problems, or challenges with

19   unemployment, housing, or transportation.  While she has some mental health issues, she is

20   willing to deal with them proactively.  At the same time, she has a strong social support

21   network, marketable skills, education and background, and a motivation to work toward

22   repaying any restitution ordered by the court.  She is also no longer working for the

23   government and is not in a position to receive bribes.  Rather, she is currently employed by

24   a family member's restaurant business, and she has a job to which she can return.  PSR

25   ¶ 42; Easter "Hensan" Timo Ltr. (describing Ms. Langford's performance managing the

26   restaurant as "[d]iligent, hard working and selfless" and stating that her continuing

27   employment with the business will help her make restitution).  Weighing these factors

28   together, Ms. Langford's risk of recidivism is extremely low.

1     It is made even more so by the deterrent effect this case has already had on her.  The

2 case has been covered by the Samoan press.  As various letters to the Court attest, Ms.

3 Langford's communities in Samoa and in the United States are well aware of the case and it

4 has brought substantial shame to her and to her family.  The case has had a profound effect

5 on her.  She is deeply regretful and wants only to make amends and also to provide for her

6 family while leading a law-abiding life.  Years in prison would have no greater deterrent

7 effect on her than a day would.  *See* U.S.C. § 3553(a)(2)(B)-(C).

8     **F.      The Need to Provide Restitution Weighs in Favor of a Shorter Period of
Incarceration.**

9

10    The last section 3553(a) factor requires the Court to consider "the need to provide

11 restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).  Pursuant to the plea

12 agreement, Ms. Langford agreed to pay restitution in an amount set by the Court, but in no

13 event less than $260,000.  Plea Agt., Dkt. 11 ¶ 10.  Ms. Langford's obligation to begin

14 repaying the American Samoa government counsels in favor of a twelve-month sentence,

15 which will enable Ms. Langford to return to gainful employment sooner.  Allowing her to

16 serve part of the sentence in home detention or community confinement would expedite

17 that process even further, and would also allow Ms. Langford to resume support and care

18 for her family – particularly her youngest son, Joshua – more quickly.

19 **III.      BUREAU OF PRISONS DESIGNATION.**

20    Ms. Langford, most of her support network, and the family she holds dear, live in

21 Copperas Cove, Texas.  In particular, Ms. Langford wants to stay near Joshua and her husband,

22 David.  Accordingly, Ms. Langford respectfully requests that the Court recommend that she be

23 designated to serve whatever term of imprisonment the Court may impose in a Bureau of

24 Prisons facility as close as possible to Copperas Cove, Texas.

25

26

27

28

1   **IV.**   **CONCLUSION**

2       For the foregoing reasons, Ms. Langford respectfully requests that the Court sentence

3 her to 12 months, allowing her to serve at least some of that time in home detention or

4 community confinement in order to allow her to begin making restitution as soon as possible

5 and to allow her to care for and support her family, especially her young son, Joshua.

6

7 Dated: June 19, 2015.

8                                 PILLSBURY WINTHROP SHAW PITTMAN LLP
                                      MARC H. AXELBAUM
9                                 LINDSAY A. LUTZ
                                    Four Embarcadero Center, 22nd Floor
10                                San Francisco, CA 94111

11

                               By:    */s/ Marc H. Axelbaum*
12                                     Marc H. Axelbaum

13                                *Attorneys for Defendant Evelyn Langford*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28